UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| JOHN DOE, a pseudonym,<br><br>        Plaintiff,<br>  -vs-<br><br>GUTTERIDGE JEANCHARLES, M.D., P.A., a Florida Corporation, and GUTTERIDGE JEAN-CHARLES, M.D., an individual,<br><br>        Defendants. | CASE NO.: 6:24-cv-00034-WWB-RMN |

**PLAINTIFF'S MOTION FOR LEAVE TO PROCEED PSEUDONYMOUSLY**

Plaintiff, John Doe ("Plaintiff"), through his undersigned counsel, respectfully seeks leave of this Court to proceed pseudonymously because the disclosure of Plaintiff's identity on the public docket will violate a substantial privacy right for Plaintiff, causing him harm that outweighs the presumption of openness in judicial proceedings.

**MEMORANDUM OF LAW IN SUPPORT**

Plaintiff is a survivor of labor trafficking and is bringing an action for damages against Defendant, under 18 U.S.C §§ 1589, 1590, and 1595, as enacted by the federal Trafficking Victims Protection Reauthorization Act ("TVPRA"). Plaintiff seeks leave to proceed anonymously because the disclosure of his identity on the public docket will violate a substantial privacy right, which outweighs the presumption of openness in judicial proceedings.

    **I.   SUMMARY OF THE FACTS**

Plaintiff is a physician from Egypt, who entered the U.S. on a J-1 Exchange Visitor

Visa to seek advanced training in a U.S. medical residency program. (Compl. ¶ 17). While in the U.S., Plaintiff lost status and accumulated unlawful presence. (Affidavit ¶ 3). Through his wife (at the time his fiancé), he was able to apply for a visa waiver and work authorization to accompany his application to adjust his status and become a permanent resident. (Id.) While these applications were pending, Plaintiff did not have work authorization and therefore could not "match" a residency program or legally be employed. (Compl. ¶ 23). During this time, Plaintiff had vulnerabilities due to his immigration status, his financial status, and his fear of not being about to "match" a residency program to pursue his dream of being a doctor.

Plaintiff applied for a job at JC Medical Center with the intent to obtain employment. (Compl. ¶¶ 25-27; Affidavit ¶ 6). Dr. Jean-Charles offered Plaintiff employment as a "Clinical Assistant" and represented that he would "shadow, learn, train, and be taught about the practice of medicine" in exchange for compensation. (Compl. ¶ 28(a); Affidavit ¶ 6). Dr. Jean-Charles deceitfully led Plaintiff to believe that the JC Medical Center had helped many similarly situated doctors get into residency programs, he would pay Plaintiff a stipend as compensation, he would reimburse moving expenses, he would write a letter to USCIS to help speed up the immigration process, and he knew that Plaintiff could not lawfully work yet but was willing to overlook that and hire him anyways. (Compl. ¶ 27). He offered Plaintiff a solution to all of his problems.

It was not until Plaintiff incurred the tremendous cost of relocating himself and his family across the United States that Defendants changed the offer and refused to pay Plaintiff. (Id. ¶ 27, 28, 33-34, 40, 45-55). Defendants maintained Plaintiff's employment and labor at JC Medical Center through fraudulent promises that Defendants would pay

Plaintiff in the future for the hours worked (id. ¶¶ 27, 28, 34, 77), he would give him a salary and future earning potential (id. ¶¶ 83-85), he would help him with immigration (id. ¶ 77), and he would help him with getting into a residency program (id. ¶¶ 27, 35, 77).

For no pay (except one $200 gift card), Dr. Jean-Charles and JC Medical Center had Plaintiff working as a practicing physician, seeing over half the daily intake of patients without supervision. (Id. ¶¶ 56, 73-75, 90). All of these patients were fraudulently being billed at the rate for Dr. Jean-Charles. (Affidavit ¶¶ 7-9). Dr. Jean-Charles also required Plaintiff to add Dr. Jean-Charles' electronic signature to orders for labs and referrals without oversight or supervision. (Compl. ¶ 81). Dr. Jean-Charles did not consult with Plaintiff on patient care and only reviewed files after treatment was rendered, if at all. (Id. ¶¶ 73, 82).

Dr. Jean-Charles finally terminated Plaintiff when he realized Plaintiff's family member knew that he was exploiting Plaintiff and confronted him (id. ¶¶ 103-108). Dr. Jean-Charles attempted to buy Plaintiff's silence by handing him $500 cash and a $450 gift card (id. ¶ 105) and attempted to "rewrite" the facts by telling Plaintiff he did not know that Plaintiff did not have work authorization when he hired him at the time of his termination. (Affidavit ¶ 17).

## II.   ARGUMENT

There is a public interest in allowing society to scrutinize government functions, including open access to attend and observe both criminal and civil proceedings. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 599-600 (1980). "The equation linking the public's right to attend trials and the public's right to know the identity of the parties is not perfectly symmetrical." *Doe v. Stegall,* 653 F.2d 180 (5th Cir. 1981). Party

3

anonymity does not inhibit the public interest to an open trial in the way that closure of a courtroom does; rather, the public can still attend and observe a trial while the Plaintiff proceeds under a pseudonym, thus preserving the constitutional interest in ensuring that "[w]hat transpires in the courtroom is public property." *Craig v. Harney*, 331 U.S. 367, 374 (1947).

Although Fed. R. Civ. P. 10(a) requires the title of the complaint to name all the parties, courts have allowed litigation under a pseudonym when a party establishes "a substantial privacy right which outweighs the 'customary and constitutionally-embedded presumption of openness in judicial proceedings.'" *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992); *Doe v. Neverson*, 820 Fed.Appx. 984, 986 (11th Cir. 2020); *Plaintiff B v. Francis,* 631 F.3d 1310, 1315 (11th Cir. 2011); *Stegall*, 653 F.2d at 186. Whether a party's right to privacy outweighs the presumption of openness should be evaluated by reviewing the totality-of-the-circumstances. *In re Chiquita Brands Int'l Inc.*, 965 F.3d 1238, 1247 n.5 (11th Cir. 2020); *Plaintiff B*, 631 F.3d at 1315.

The Eleventh Circuit has laid out a two-part test to determine if anonymity is appropriate. *Plaintiff B*, 631 F.3d at 1316 (citing *Stegall*, 653 F.2d at 186). **Part One** of the test analyzes if the plaintiff has a substantial privacy right. A substantial privacy right may exist where the plaintiff (1) is challenging government activity; (2) would be compelled, absent anonymity, to disclose information of utmost intimacy; **or** (3) would be compelled, absent anonymity, to admit an intent to engage in illegal conduct and thus risk criminal prosecution." *Chiquita Brands*, 965 F.3d at 1247 (emphasis added); *see also Plaintiff B*, 631 F.3d at 1316. **Part Two** of the test also requires the court to evaluate other factors, including if the plaintiff is a minor, if there was violence or threats of violence,

or if there is a unique threat of fundamental unfairness to the defendant. *Id.* (citing *S. Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe*, 599 F.2d 707, 713 (5th Cir. 1979)). Notably, these factors are not "prerequisites to bringing an anonymous suit," but are guideposts for the court's "fact-sensitive" determination. *Freedom from Religion Found., Inc. v. Emanuel Cty. Sch. Sys.*, 109 F. Supp. 3d 1353, 1357 (S.D. Ga. 2015) (citing *Stegall*, 653 F.2d at 186).

> **A. Plaintiff has a substantial privacy right because without pseudonymity, Plaintiff would be compelled to admit an intent to engage in illegal conduct and risk criminal prosecution.**

If Plaintiff is not allowed to proceed pseudonymously, he will have to admit that he both intended to and potentially did engage in illegal conduct through the unauthorized practice of medicine, thus risking criminal prosecution. (Compl. ¶ 11). In Florida, an "unlicensed physician is a person holding a degree as a medical doctor or its equivalent, but not licensed by the Board of Medicine," to include "resident physicians, assistant resident physicians, house physicians, interns, or fellows in fellowship training which leads to subspecialty board certification or in fellowship training in a teaching hospital." Fla. Admin. Code Ann. R. 64B8-6.001 (2024). It is a third-degree felony to practice medicine without a license. Fla. Stat. § 456.065(2)(d)1.

In the time period identified in the Complaint, Plaintiff was a graduate of medical school, but he had not been able to "match" with a residency program. (Id. ¶¶ 23-24). Needing to improve his qualifications, Plaintiff accepted a position with JC Medical Center, believing this would be a clinical program to give him the supervised oversight needed to learn, grow, and hone his medical skills. (Id. ¶¶ 23-24). At the time, he had applied for but had not been granted work authorization in the United States. (Id. ¶¶ 21-

5

23; Affidavit ¶ 4). Nonetheless, Plaintiff and his fiancé needed income and Plaintiff needed to work in order to survive and support his fiancé while he attempted to become a practicing physician. (Compl. ¶¶ 25-27, 33-34, 78; Affidavit ¶ 5). Plaintiff applied for a job at JC Medical Center with the intent to obtain employment. (Compl. ¶¶ 25-27; Affidavit ¶ 6). Dr. Jean-Charles offered Plaintiff employment as a "Clinical Assistant" and represented that he would "shadow, learn, train, and be taught about the practice of medicine" in exchange for compensation. (Compl. ¶ 28(a); Affidavit ¶ 6). Dr. Jean-Charles caused Plaintiff to believe that he held the "keys" to helping him "match" a medical residency program and take the next step towards becoming a doctor. (Compl. ¶ 53). Instead, Dr. Jean-Charles and JC Medical Center caused Plaintiff to begin working as a practicing physician, seeing 30-40 patients a day without supervision. (Id. ¶¶ 56, 73-75). The practice had 50-60 patients come to the office each day (Id. ¶ 57), which means Plaintiff was treating over half of the patients each day without supervision. After a few months, Dr. Jean-Charles had Plaintiff begin adding Dr. Jean-Charles' electronic signature to orders for labs and referrals. (Id. ¶ 81). Dr. Jean-Charles did not consult with Plaintiff on patient care and only reviewed files after treatment was rendered, if at all. (Id. ¶¶ 73, 82). Having no more than a medical degree, Plaintiff was plausibly operating as a physician without a license from the Florida Board of Medicine, in violation of Florida law.

Further, for those patients that had insurance, JC Medical Center would bill the insurance company for the rate associated with a licensed physician. (Affidavit ¶¶ 7-9). Many of those patients saw Plaintiff, not Dr. Jean-Charles (Doc. 1 ¶ 56; Id.), and therefore should not have been billed at the same rate as if they had been treated by the licensed,

6

supervisory medical doctor, Dr. Jean-Charles. Given that he was aware of Dr. Jean-Charles' billing, Plaintiff could plausibly be prosecuted as a principle to fraud, or insurance fraud. *See* Fla. Stat. § 817.234.

If Plaintiff were to proceed in this case without a pseudonym, he could be potentially prosecuted by the State of Florida for one or more felony offenses. As such, Plaintiff has alleged a substantial privacy right, satisfying Part One of the two-part test for pseudonymity under *Plaintiff B*, 631 F.3d at 1316.

### B. Plaintiff's substantial privacy right outweighs the presumption of openness in judicial proceedings.

Part Two of the two-part test for pseudonymity outlined by the Eleventh Circuit in *Plaintiff B* evaluates whether the substantial privacy right outweighs the presumption of openness in judicial proceedings. To determine this, the court must weigh all the factors involved, including but not limited to whether the plaintiff is a minor, if there was violence or threats of violence, or if there is a unique threat of fundamental unfairness to the defendant. *Id.*

"The equation linking the public's right to attend trials and the public's right to know the identity of the parties is not perfectly symmetrical." *Stegall*, 653 F. 2d at 185. "The public right to scrutinize governmental functioning, is not so completely impaired by a grant of anonymity to a party as it is by closure of the trial itself, as the assurance of fairness preserved by public presence at a trial is not lost when one party's cause is pursued under a fictitious name." *Richmond Newspapers, Inc.*, 448 U.S. at 599-600.

### 1. Plaintiff is only requesting leave to proceed pseudonymously in pretrial proceedings, not at trial.

In one of the landmark cases on this issue – *Does I thru XXIII v. Advanced Textile*

7

*Corp.* – the Ninth Circuit stated, "[w]e recognize that the balance between a party's need for anonymity and the interests weighing in favor of open judicial proceedings may change as the litigation progresses. In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings, *see* Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name, *see* Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case." *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000). Plaintiff is merely requesting leave to file this Complaint pseudonymously, and to proceed in the pretrial proceedings pseudonymously. Should Plaintiff determine that anonymity for trial is merited, a separate motion will be filed at the appropriate time.

### 2. Plaintiff will provide his identity to the Defendants.

As a general rule, courts nationwide have determined that while a plaintiff's identity may be protected from the general public, it will prejudice the defendant to not know whom to investigate and will frustrate the defendant's ability to participate meaningfully in discovery without knowing the identity of the accuser. On the other hand, if the public is barred from knowing the identity of a plaintiff, but the defendant is made aware of the identity, the defendant is not prevented from "conducting a full range of discovery in building a defense for trial." *Plaintiff B,* 631 F.3d at 1318-19. It is well established that when balancing the different interests involved in cases such as these, "courts have permitted parties to enter into protective orders that permit the limited disclosure of a plaintiff's identity for discovery purposes on the condition that the defendants do not disclose it to the general public." *Advanced Textile Corp.*, 214 F.3d at 1069.

Anonymity would be limited to the pseudonym that the Plaintiff uses, not to who the Plaintiff is in every other respect. *See James v. Jacobson*, 6 F.3d 233, 243 (4th Cir. 1993). Plaintiff is willing to provide his full name and identifying information to Defendant, subject to a protective order. Furthermore, there are no alternative mechanisms for protecting the identity of Plaintiff. With this concession in place, the Defendants will not be prejudiced if Plaintiff's motion is granted and, therefore, this factor weighs in favor of allowing Plaintiff to proceed under a pseudonym.

### 3. Plaintiff is a labor trafficking survivor whose exploitation will cause him great embarrassment, humiliation, and may subject him to retaliation.

Although it may not qualify as a matter of the utmost intimacy, the Court should still weigh and balance that Plaintiff is a victim of labor trafficking, which has been recognized by Congress as a severe form of trafficking in persons. 22 U.S.C. § 7102. Traffickers are master manipulators that prey on the vulnerabilities of their victims.

Plaintiff was an immigrant in the United States who had several vulnerabilities – he needed income to survive, he had not been granted the legal ability to work in the U.S. yet, and he had not "matched" with a residency program to pursue his dream of becoming a doctor. (Doc. 1 ¶ 17, 23, 27). Defendants embodied classic trafficking manipulation patterns. Dr. Jean-Charles deceptively and fraudulently offered Plaintiff a solution to all of his needs – he would fix his economic problem by paying him, he would fix his immigration problem but writing a letter for him to USCIS, and he would help him achieve his dreams by providing a teaching program with Dr. Jean-Charles' recommendation letter that should enable him to "match" a residency program. (Id. ¶¶ 27, 28, 138, 146). It was not until Plaintiff incurred the tremendous cost of relocating himself and his family

9

across the United States that Defendants changed the offer and refused to pay Plaintiff. (Id. ¶ 27, 28, 33-34, 40, 45-55). Defendants maintained Plaintiff's employment and labor at JC Medical Center through fraudulent promises that Defendants would pay Plaintiff in the future for the hours worked (id. ¶¶ 27, 28, 34, 77), he would give him a salary and future earning potential (id. ¶¶ 83-85), he would help him with immigration (id. ¶ 77), and he would help him with getting into a residency program (id. ¶¶ 27, 35, 77). Dr. Jean-Charles finally terminated Plaintiff when he realized someone else knew that he was exploiting Plaintiff (id. ¶¶ 103-108).

In addition to fraud and deceit, Dr. Jean-Charles threatened legal process against Plaintiff when he converted Plaintiff's paid job opportunity to a "volunteer" position without pay, isolated Plaintiff by instructing Plaintiff not to speak to anyone else about what was happening and then threatened him with immigration by stating that working with Defendants was a "dangerous and delicate situation" that had to remain silent. (Id. ¶ 46). Taking into account context and the surrounding circumstances, Plaintiff understood this statement was a veiled threat that Plaintiff could get in trouble with immigration. (Id. ¶ 47).

Despite his actions, Dr. Jean-Charles is still a physician operating in Central Florida and the medical community and Plaintiff has not been able to "match" a residency program to date (Affidavit ¶¶ 10-11). Dr. Jean-Charles used threats and deception to exploit Plaintiff, (Compl. ¶¶ 46-49, 71, 77). Plaintiff reasonably fears that based on the prior conduct, Dr. Jean-Charles would retaliate against. (Affidavit ¶¶ 12-17). Dr. Jean-Charles has shown a pattern of manipulation – he used polarizing praise and ridicule to cause Plaintiff to feel a need to please him and obey him, he became angry when he was

questioned about legitimate concerns to cause Plaintiff not to question him, he offered opportunities and took them away if Plaintiff did not comply, and he tried to isolate and silence Plaintiff about his exploitation (Id.). Plaintiff reasonably fears that Dr. Jean-Charles will smear his reputation to discredit him in the medical community in an effort to protect himself. Anonymity and a subsequent protective order (which will be forthcoming) are the only way to prevent Defendants from retaliating against Plaintiff professionally for bringing this case to light.

### III. CONCLUSION

Plaintiff has a substantial privacy right because absent anonymity, he would be compelled to admit that he intended and potentially did engage in criminal conduct by practicing medicine without a license and potentially acting as a principle to insurance fraud; to admit this without anonymity would risk criminal prosecution. That substantial privacy right outweighs the presumption of openness in judicial proceedings because Plaintiff's motion is limited in scope to the pre-trial proceedings, Plaintiff will provide his identity to Defendants to avoid any fundamental unfairness to the Defendant, and Plaintiff seeks to avoid humiliation and retaliation by Defendants for bringing this suit based on the pattern of conduct already exhibited by Dr. Jean-Charles. When the totality-of-the-circumstances are evaluated and weighed, Plaintiff has a substantial privacy interest that outweighs the presumption of open judicial proceedings and should be permitted to proceed pseudonymously at this stage of the litigation.

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was delivered to a Process Server for personal service upon the Defendant.

Dated: <u>January 19, 2024</u>　　　　　　　　Respectfully Submitted,

　　　　　　　　　　　　　　　　By:　*/s/ Lisa D. Haba*
　　　　　　　　　　　　　　　　　　　Lisa D. Haba (FBN 077535)
　　　　　　　　　　　　　　　　　　　**THE HABA LAW FIRM, P.A.**
　　　　　　　　　　　　　　　　　　　1220 Commerce Park Drive, Suite 207
　　　　　　　　　　　　　　　　　　　Longwood, Florida 32779
　　　　　　　　　　　　　　　　　　　Tel.:  844-422-2529
　　　　　　　　　　　　　　　　　　　lisahaba@habalaw.com

　　　　　　　　　　　　　　　　　　　*Attorney for Plaintiff*