**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

JOHN DOE, a pseudonym,

      Plaintiff,

vs.                              CASE NO.:   6:24-cv-00034-RMN

GUTTERIDGE JEANCHARLES, M.D., P.A.,
a Florida Corporation, and
GUTTERIDGE JEAN-CHARLES, M.D.,
an individual,

      Defendants.
_____/

### DEFENDANTS' VERIFIED MOTION FOR SANCTIONS PURSUANT TO RULE 11

    **COME NOW** Defendants, Gutteridge JeanCharles, M.D., P.A., a Florida professional service corporation, and Gutteridge Jean-Charles, M.D.("Dr. Jean-Charles"), and pursuant to Rule 11, Federal Rules of Civil Procedure, file this Motion for Sanctions, Attorney's Fees and Costs, stating:

### SUMMARY OF MOTION

    1.    Plaintiff, who is a 31-year-old married, male physician, a graduate of a top medical school in Egypt, and a former general surgery medical resident, has sued Defendants claiming they human-trafficked him.  The Defendants are Dr. Jean-Charles, a medical doctor long-established in Orlando, known for his humanitarian works, and his medical group, a Florida professional services corporation.  The Plaintiff dropped out of his general surgery medical residency program in New York City in 2019, and lost his J-1 visa as a result;  it expired on December 31, 2019.  Plaintiff stayed in the U.S. illegally in order to find an American wife, got married, moved to Colorado, and much later applied for a

green card.

2.      On March 24, 2022, the Plaintiff, who was still in the U.S. illegally, without a visa and without a green card, responded to a job listing for a clinical assistant which the Defendants had posted on Indeed.com.  The e-mail dated March 24, 2022, from Dr. John Doe, Exhibit "1", stated: "I live in Colorado. I am able to relocate. I am a green cardholder [sic]." The latter statement was false because Plaintiff Dr. Doe, did not then have a green card.  Plaintiff was attempting to entrap the Defendants into violating the law by hiring him.

3.      Plaintiff Dr. Doe, requested to come to Orlando, Florida, at his own expense, to visit the Defendants to decide whether or not he wanted to work with the Defendants. On April 1, 2022, he personally visited the Defendants' medical clinic.  He still falsely stated to the Defendants that he had a green card and was permitted to legally work in the U.S. He left to return to Colorado stating that he wanted to talk to his wife about accepting the position in Orlando.

4.      Plaintiff later communicated to Defendants that he would accept the job that had been listed on Indeed.com and could start on or about April 18, 2022.  Exhibit "2."

5.      Plaintiff then traveled at his own expense to Orlando to begin work with the Defendants on or about April 18, 2022.

6.      During the check-in process with the Defendants' medical practice on April 18, 2022, Plaintiff was unable to complete the process because he did not have a green card, did not have a visa, and had no authorization to legally work in the U.S.  Exhibit "3." Plaintiff then admitted to Defendants that he had lied about having a green card and could not legally work in the U.S.

7.      Since Defendants already had a program in place to provide voluntary,

unpaid "externships" or "observerships" to medical graduates,[1] Plaintiff was offered one. Plaintiff Dr. Doe agreed to such a position on an unpaid basis.  Plaintiff informed Defendants that he could afford to accept an unpaid externship or observership because his wife had a good job working for the University of Colorado and he (Plaintiff) was working part time tutoring applicants to take the United States Medical Licensing Examination (USMLE) Step Exams.  In an e-mail dated April 19, 2022, Dr. Jean-Charles confirmed with Plaintiff Doe, that he had agreed to accept the voluntary (unpaid) externship for three (3) months.  Plaintiff Doe replied the same day:  "Acknowledged."  Exhibit "4."

8.     Plaintiff then was allowed to participate in the unpaid "externship" or "observership" for several months.  However, Plaintiff was not allowed by the Defendants to provide medical services for or treat patients independently since he was not licensed in Florida.  At all relevant times, Plaintiff had supervisors who were licensed physicians or licensed health professionals, and they provided all patient medical care and treatment required.  Plaintiff abruptly left without notice in June 2022.

9.     After Plaintiff left, he and one or more family member sent blackmail

---

[1]     Unlike a regular medical internship, a medical observership or externship is much shorter and is usually unpaid.

> Externs also do not typically get paid. Some externships, however, such as those in healthcare, may offer payment. While an internship can last several months or even a year, externships usually last for much shorter periods--often a few days or weeks.

(https://www.bestcolleges.com/blog/externship-vs-internship/, accessed Mar. 30, 2024) Medical school graduates often accept externships in order to obtain actual, practical experience while trying to obtain a medical residency.

demands to Defendants attempting to extort Four Million Dollars ($4,000,000) from the Defendants under threat of reporting Defendants to law enforcement agencies including Homeland Security, the Florida Board of Medicine, and others.  Exhibit "5."

10.    Defendants believe that Plaintiff has violated Rule 11(b), Federal Rules of Civil Procedure, which states:

> (b)    **Representations to the Court**.  By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1)  it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2)   the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3)   the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Specific examples of the false and misleading statements that are made in the Complaint start at paragraph 39 of this Motion, below.

## BACKGROUND AND FACTS

### The Defendants

11.     Dr. Jean-Charles is a licensed medical doctor who provides a great deal of charitable medical services to the local community through his charitable foundation.  He also provides specialized medical teaching assistance to both American Medical Graduates (AMGs) and International Medical Graduates (IMGs) seeking to come to the United States to practice medicine.  Dr. Jean-Charles is now being sued by a married 31-year- old male physician, an International Medical Graduate, that he tried to help.

12.     Dr. Jean-Charles, himself an immigrant from Haiti, through his medical practice and through JC Medical Foundation, Inc., provides unpaid "observerships" (also called "external clinical rotations" or "externships"), listed on the American Medical Association's website.

13.     Furthermore, Defendant Dr. Jean-Charles since becoming a physician in the United States, has dedicated himself to assisting other IMGs seeking to become licensed physicians and medical residents in the U.S., in addition to doing the same for American Medical Graduates.

14.     Defendant Gutteridge JeanCharles, M.D., P.A., d/b/a JC Medical, Inc., is a separate, professional service corporation, incorporated under the laws of the state of Florida.  It is a large medical practice which has a number of employees, including at least three (3) other licensed physicians and several other licensed health professionals working for it and treating patients for it. As such, it is a separate individual under Florida law.

15.     Gutteridge JeanCharles, M.D., P.A., d/b/a JC Medical, Inc., offers services

in internal medicine to the Central Florida area.  JC Medical, Inc., also has a team of its employees (licensed physicians, nurses and medical assistants) who provide voluntary medical services to the Orlando Rescue Mission and other community programs in the Orlando area.

16.    Dr. Jean-Charles, through his medical group, Gutteridge JeanCharles, M.D., P.A., d/b/a JC Medical, Inc., provides medical services to an overwhelmingly indigent and underserved population.

### The Plaintiff

17.    The Plaintiff filed the Complaint under the pseudonym "John Doe" falsely alleging a number of egregious misdeeds and misconduct on the part of Defendants.

18.    The Plaintiff is actually known to the Defendants to be a male medical doctor, now approximately 31 years old, who graduated from one of the top medical schools in Egypt. He was accepted into a general surgery residency program at Brookdale Medical Center in New York City and came to the United States in or around 2018 to become a general surgeon.  He is believed to have entered the U.S. on a J-1 visa, under sponsorship by and through the Educational Commission for Foreign Medical Graduates (ECFMG).

19.    From about 2016-2017, Plaintiff Dr. Doe also performed at least four (4) other unpaid, voluntary "observerships" or "externships" of the same type as he performed with the Defendants.  These were at major hospitals in New Jersey and Chicago.  Exhibit "6."

20.    Plaintiff was very familiar with unpaid externships, because he previously had performed quite a few, as follows:

    a.    In the resume that he presented to JC Medical, Inc., (JCMI) in

connection with his application, Plaintiff stated had an unpaid externship in internal medicine at Jersey Shore University Medical Center in Neptune, New Jersey, during July 2016, working for a Dr. Odejobi, working an average of 60 hours per week.  Exhibit "6."

      b.    In the same resume, Plaintiff indicated that he had performed another unpaid externship in internal medicine at Jersey Shore University Medical Center in August 2016, working for a Dr. Chinnici, working an average of 40 hours per week.  Exhibit "6."

      c.    In his resume, Plaintiff showed he had performed an unpaid externship in neurological surgery at the Brain and Spinal Surgery Center, Troy, Michigan, in July 2017, working for a Dr. Zamorano, working an average of 40 hours per week.  Exhibit "6."

      d.    In the same resume, Plaintiff indicated that he had performed an unpaid externship in general surgery at the St. James Franciscan Hospital, Chicago Heights, Illinois, working for a Dr. Vera, from July 2017 through August 2017, working an average of 45 hours per week.  Exhibit "6."

21.    The foregoing facts show that Plaintiff was not some uneducated, naive teenager who was taken advantage of by the Defendants.  In fact, he was a cunning manipulator who attempted to set up and entrap the Defendants for monetary gain.

## Additional Background Facts

22.    Plaintiff has filed an unsubstantiated suit, including inflammatory and frivolous allegations of violating the Trafficking Victims Protection Reauthorization Act (human trafficking), against the Defendants.  The allegations, while provocative, have no basis in law or fact.

23.    The crux of the complaint is that the Defendants allegedly targeted Plaintiff,

an allegedly "desperate and vulnerable" immigrant (along with other unnamed, unidentified phantom immigrants), "luring" him to work at JC Medical Center with the promise of compensation and to "match" into a residency program. Defendants then allegedly exploited Plaintiff and the phantom other residents by withholding payment or underpaying them. (Complaint, Para. 2.)

24.     The main two (2) problems with this allegation are:

a.     It is completely false; and

b.     It would have been a violation of federal law[2] for the Defendants to have hired and paid Plaintiff, who was an illegal alien at the time without a visa, green card or work authorization.

25.     More specifically, Defendants are falsely alleged to have forced Plaintiff into labor trafficking by obtaining the labor or services of Plaintiff in the medical practice through fraud, misrepresentation, and coercion. Actually, the exact opposite is true. There is no evidence to support the central allegations of the claims asserted, and Plaintiff is the one who committed the fraud and misrepresentation in an attempt to be illegally hired.

26.     The actual true facts show that it was the Plaintiff who attempted to lure the Defendants into hiring him through fraud and misrepresentation. Exhibit "1."

27.     During 2022, Defendant Gutteridge JeanCharles, M.D., P.A. (using its registered fictitious business name JC Medical, Inc. ("JCMI" herein)) and JC Medical Foundation, Inc. ("JCMFI"), posted on Indeed.com open positions, including one for a

---

[2]     8 U.S.C. § 1324a(a)(1)(A), a subsection of the Immigration Reform and Control Act (IRCA), makes it unlawful for any person or other entity to hire, recruit, or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien, as defined in subsection 1324a(h)(3) of the Act.

"clinical assistant."  Indeed.com would ask a series of "screening requirement" questions to any applicant for the clinical assistant position.  One of the screening questions was "Are you authorized to work in the following country: United States?" In order to get past the screening, Plaintiff would have had to have falsely answered "Yes" when applying.  It is believed that Plaintiff did provide a false answer to get past this screening.

28.     However, in addition to the foregoing, Plaintiff Dr. Doe sent the Defendants an e-mail dated March 24, 2022, stating: "I live in Colorado. I am able to relocate. I am a green cardholder [sic]."  Exhibit "1."  The latter statement was false because Plaintiff Dr. Doe, did not then have a green card and he knew it.

29.     Plaintiff voluntarily traveled at his own expense from Colorado to Orlando in April 2022.  While he was at the offices of the Defendants, he was asked to complete certain forms (including a Form I-9[3]) and to produce documents showing that he was authorized to work in the U.S.  He was unable to do so.  He admitted at that time that he had lied about having a green card.

30.     Because Plaintiff did not have the proper documents to work in the U.S., he requested to work as a volunteer with JC Medical Center until he received his green card from U.S. Citizenship and Immigration Services (USCIS).  Defendant Dr. Jean-Charles agreed to allow Plaintiff to perform a voluntary "externship" or "observership" for three (3) months.  Exhibit "4."

31.     Before the three (3) month period of the voluntary externship was up, the

---

[3]     Form I-9 (officially the "Employment Eligibility Verification"), is a United States Citizenship and Immigration Services (CIS) form mandated by the Immigration Reform and Control Act of 1986. It is used to verify the identity of persons legally residing in the United States and to verify that they have legal authorization to work in the United States.

Plaintiff left the externship.

### Grounds for Striking the Complaint as a Sham Pleading as Sanctions

32.     The allegations in the Complaint are, for the most part, false and fraudulent, made up out of whole cloth.  The entire Complaint is a sham and a fraud upon the Court.

33.     The Plaintiff, seeking to hide behind the shield of anonymity by filing as "John Doe," is not the poor, vulnerable, defenseless person the Complaint tries to make him out to be.  He is, instead, an intelligent, world-wise, conniving manipulator who has lived in cities such as Cairo, Chicago, and New York, and practiced medicine as a general surgery resident in New York.  He is and was a married, 29-year-old male at the relevant times in March-June 2022.  His wife was an upper level employee of the University of Colorado. He told Defendants that due to his wife's income, he could afford the unpaid externship.

34.     The Defendants are not the cruel, tyranical, money-grubbing slave-drivers the Complaint tries to paint them as.  In fact, the main Defendant, Dr. Jean-Charles, himself an immigrant, has made it a mission to help, without pay or compensation, foreign medical graduates such as the Plaintiff.   The testimonials of some can be seen at: https://www.jcmi.us/testimonials (as of April 22, 2024).

35.     It is extremely doubtful that the American Medical Association would list the observerships/externships of the Defendants on its website[4] if there were any truth at all to any of the Plaintiff's allegations made in the Complaint.

36.     The Complaint filed against Defendants made a number of allegations that

---

    [4]    This is listed on the American Medical Association's website at: https://www.ama-assn.org/education/international-medical-education/observership-program-listings-international-medical  (as of April 22, 2024) under "America Clinical Rotation JCMI."

are outright false, fraudulent, or materially misleading statements of law and fact.  Plaintiff made these misleading statements with no regard for the truth and for the sole purpose of misleading the Court and to attempt to intimidate the Defendants into paying him a big monetary settlement, in furtherance of a conspiracy to commit extortion.

37.     IRCA prohibits employers from hiring and employing an individual for employment in the U.S. knowing that the individual is not authorized with respect to such employment.  Employers are also prohibited from continuing to employ an individual knowing that he or she is unauthorized for employment.  This law also prohibits employers from hiring any individual, including a U.S. citizen, for employment in the U.S. without verifying his or her identity and employment authorization to work in the U.S. on Form I-9.

38.     Having initially lied to Defendants about having a green card, Plaintiff admitted he had no authorization to legally work in the U.S. and refused to ever provide Defendants any identification as would be required to complete Form I-9.

**Specific Examples of False or Fraudulent Statements in the Complaint**

39.     The following are just a few of the false or fraudulent statements made in the Complaint:

40.     In Paragraph 2 of the Complaint, Plaintiff falsely states:  "Dr. Jean-Charles targeted desperate and vulnerable Immigrant [sic] Medical Graduates ("IMG"), he lured them to work for JC Medical Center."  In fact, Dr. Jean-Charles runs a world-renowned program for assisting both American and international medical graduates (IMGs) with unpaid "externships" or "observerships."  His program is publicized on the American

Medical Association's website.[5]  Some of the testimonials of those who have participated are at:  https://www.jcmi.-us/testimonials (accessed Mar. 30, 2024).  Furthermore, Plaintiff was extremely familiar with such unpaid voluntary externships or observerships, because he had previously participated in a least four (4) of them in the U.S. from 2016-2017.

41.    The other allegations in Paragraph 2 of the complaint are likewise false.

42.    Paragraphs 10 and 17-21 of the Complaint are misleading, because they falsely indicate that Plaintiff Dr. Doe was in the U.S. legally during March through June 2022 and had authorization to be legally employed.  In fact, when Plaintiff dropped out of his New York general surgery residency program in 2019, his J-1 visa expired on December 31, 2019.  He remained in the U.S. illegally and was seeking work illegally. When he applied to Defendants for a job in March 2022, he lied and stated he had a green card when he did not.  Exhibit "1."  As of July 2022, when Plaintiff left his observership with Defendants he still did not have a visa, green card or work authorization.

43.    In Paragraph 37 of the Complaint, Plaintiff falsely states "At all material times to this Complaint, Dr. Jean-Charles was the sole, licensed doctor at JC Medical Center." This is false and is known by the Plaintiff to be false.  There were, in fact, at least three (3) other Florida licensed physicians and several other licensed health professionals[6] working at JC Medical Center and treating patients at all times the Plaintiff physician was there.

---

5    (See, https://www.ama-assn.org/education/-international-medical-education/observership-pro-gram-listings-international-medical/, accessed Mar. 30, 2024.)

6    The Defendants had at least three (3) other licensed physicians (in addition to Dr. Jean-Charles), two (2) licensed advanced practice registered nurses (APRNs), and one (1) licensed physician assistant (PA), who were treating patients in the same clinic at the same time as the Plaintiff was performing his observership.

44.     In Paragraph 60 of the Complaint, the same lie is stated again, only this time it is stated to be made "Upon information and belief."

45.     In Paragraph 45 of the Complaint, Plaintiff falsely states that Dr. Jean-Charles had knowledge of Plaintiff's lack of work authorization and agreed to "overlook it to entice Plaintiff to take the job." (Complaint Para.45.) This statement is false and is belied by the Plaintiff's own words in Plaintiff's March 24, 2022, e-mail he sent to the Defendants when applying for a job, Exhibit "1," in which he falsely stated that he was "a green cardholder [sic]." Exhibit "1."

46.     In Paragraph 57 of the Complaint Plaintiff falsely states that he "was seeing 30-40 patients a day" indicating that he was independently treating these patients as a physician. This is false. The Defendants routinely have no more than 45 patient per day on any regular day and multiple licensed physicians and health practitioners[7] treat them.

47.     In Paragraph 59 of the Complaint, Plaintiff falsely states: "Most of the patient population served spoke Creole and little to no English." Not only is this a false statement, but it is a racist statement, perhaps meant to invoke some type of misplaced sympathy by this Court.

48.     Plaintiff falsely stated in Paragraph 87 of the Complaint that Dr. Jean-Charles "retaliated by cancelling the job offer" to Plaintiff after Plaintiff requested that he be paid

---

[7]     As stated in paragraph 40 of this Motion above, the Defendants had at least three (3) other licensed physicians (in addition to Dr. Jean-Charles), two (2) licensed advanced practice registered nurses (APRNs), and one one (1) licensed physician assistant (PA) who were treating patients in the same clinic at the same time as the Plaintiff claims he was "seeing" the patients. In addition, the clinic also had a number of nurses and medical assistants as support staff. Plaintiff Dr. Doe may have literally "seen" the patients as they walked through, but he certainly did not treat the patients.

the money he was originally promised.  This is false.  Dr. Jean-Charles rescinded any job offer Plaintiff may have believed he had when Plaintiff admitted that he lied about having a green card.  Exhibits "1" and "3."  Dr. Jean -Charles knew that it was a violation of federal law to hire any foreign national who did not have a visa or other work authorization.

49.     Plaintiff kept promising that he would receive a green card "any day now" numerous times while performing his unpaid observership. He never did. As of the July 2022, Plaintiff still had no green card.

50.     In Paragraph 105 of the Complaint, Plaintiff alleges that "Dr. Jean-Charles gave Plaintiff a bribe to silence him; he handed him an envelope with $500 cash and a $450 Visa gift card."  This is totally false.

51.     Plaintiff falsely states in Paragraph 115 of the Complaint that the Defendants "obtained the labor or services of Plaintiff through fraud, misrepresentation, and coercion." In fact, Plaintiff obtained entry into the medical practice by illegally applying for a paid position and falsely telling Defendants on March 24, 2022, that he had a green card. Exhibit "1."

52.     In Paragraph 118 of the Complaint Plaintiff states:  "Defendants . . . engaged in a scheme, plan, or pattern intended to cause Plaintiff to believe that if he did not continue to provide labor or services, he would suffer serious nonphysical harm. . . . "  This is simply not true.  What the plan or scheme is not given. What the "nonphysical harm" is not given.  Plaintiff was a large, male 29-year-old physician, married at the time. He was worldly-wise, had lived in large cities and previously worked in American medical settings.

53.     In Paragraph 130 of the Complaint, Plaintiff alleges that "Defendants . . . were collectively participating in a venture in which they knew or should have known was

engaging in forced labor of Plaintiff." This is false. At no point did Defendants force Plaintiff into labor at JC Medical Center. At no time did Defendants force Plaintiff to do anything at JC Medical Center. Plaintiff performed his duties as a "medical observer" or "extern" on a voluntary basis (at Plaintiff's request) while promising that he would receive his green card at any time. Furthermore, Plaintiff had previously performed at least four (4) similar unpaid observerships at medical practices in New Jersey and Chicago from 2016-2017.  Has Plaintiff likewise sued those other four (4) physicians from those other four (4) observerships for "human trafficking"?

54.     In Paragraph 161 of the Complaint, Plaintiff falsely states: "Plaintiff and JC Medical Center entered into a valid and enforceable Employment Contract."  Not only is this a false statement of fact, but it would have been illegal, a violation of federal law, for Defendants to have done so.  As of July 2022, Plaintiff did not have a green card, visa or permission to work in the U.S.

**The Complaint Is in Furtherance of Plaintiff's Extortion Scheme**

55.     On July 23, 2022, Plaintiff sent an extortion e-mail to Defendant Dr. Jean Charles. In it Plaintiff demanded a payment of Four Million Dollars ($4,000,000) threatening to report Dr. Jean-Charles to law enforcement authorities, including "Homeland Security, Florida Board of Medicine, and Florida Labor Relations Board [sic]" if Defendants failed to pay the demanded amount.  Exhibit "5."

56.     The extortion demand was actually signed by both Plaintiff and Plaintiff's wife Melisha Begerman, with what appears to be their "live" or "wet" signatures.  Exhibit "5".

57.     A few days later, a paper copy of the same extortion package was hand

delivered by a courier to the front desk of Defendant JeanCharles, M.D., P.A.

58.    The Defendants refused to pay the extortion demand.

59.    The Complaint is in furtherance of the extortion demands of the Plaintiff and his wife.

60.    The Complaint is, therefore, also filed for an improper purpose in violation of Rule 11(b)(1), Federal Rules of Civil Procedure, including to harass and extort Defendants into paying an exorbitant, windfall amount of money to Plaintiff.

## GROUNDS FOR MOTION FOR RULE 11 SANCTIONS

61.    Defendants are entitled to be awarded sanctions against Plaintiff pursuant to Rule 11, Federal Rules of Civil Procedure, because there is no basis in law or fact for the claims asserted.  The claims are not presented for a proper purpose, and are without evidentiary support.

62.    All ten (10) of the causes of action listed in the Complaint incorporate the false, fraudulent, or materially misleading statements of fact as set forth from Paragraphs 1 through 109 of the Complaint.  Some Counts include additional false statements of fact as set forth above.

63.    The most cursory of investigations of the facts in this case would have led Plaintiff's counsel to the same conclusions and the Complaint would not have been filed.

## MEMORANDUM OF LAW

The thrust of Rule 11(b)(2) & (3), Federal Rules of Civil Procedure, is whether a claim is legally or factually frivolous.  See Thompson v. RelationServe Media, Inc., 610 F.3d 628, 664 (11th Cir. 2010).  The Complaint in this case is factually and legally frivolous.

A claim is frivolous when there is no "reasonable factual basis" for the claim. Gulisano v. Burlington, Inc., 34 F.4th 935, 942 (11th Cir. 2022). In the present case, there is simply no reasonable factual basis for any claim made in the Complaint. At no time relevant to the events in the Complaint did the Plaintiff have any right to work in the U.S. for pay. In fact, it would have been a violation of federal law for the Defendants to have offered him any position for any pay. He attempted to deceive the Defendants into illegally hiring him. Plaintiff's J-1 visa had expired on December 31, 2019, and Plaintiff knew he was in the U.S. illegally and could not legally be employed after that date.[8]

A party moving for Rule 11 sanctions against an opposing counsel need only establish that opposing counsel filed a complaint or other document that is based on a legal theory that has no reasonable chance of success. Hajdasz v. Magic Burgers, LLC, 805 F. App'x 884 (11th Cir. 2020). That is exactly the situation at present. Plaintiff's frivolous filing has no reasonable chance of success.

Rule 11, Federal Rules of Civil Procedure, "is intended to deter improper litigation techniques, such as delay and bad faith." Briggs v. Briggs, 245 F. App'x 934, 936 (11th Cir. 2007) (citing Fed. R. Civ. P. 11, 1983 Advisory Committee notes). In the present case, there can only be bad faith attributed to the motives behind filing such a Complaint.

Rule 11(c), permits sanctions for any violation of Rule 11(b). "The purpose of Rule 11 sanctions is to reduce frivolous claims . . . and motions, and to deter costly meritless maneuvers." Kaplan v. DaimlerChrysler, A.G., 331 F.3d 1251, 1255 (11th Cir. 2003).

In the Eleventh Circuit, a Rule 11 challenge as to frivolity requires a two-prong

---

[8]   See note 1, above.

inquiry:  "Whether the legal claims or factual contentions are objectively frivolous, and, if so, whether a reasonably competent attorney should have known they were frivolous." Thompson, 610 F.3d at 665.

Under the first prong of the test:  "A factual claim is frivolous if no reasonably competent attorney could conclude that it has a reasonable evidentiary basis."  Id.  A reasonably competent attorney would have to conclude that there was no reasonable evidentiary basis for the allegations made.  "Both inquiries measure attorney conduct under an objective reasonably competent attorney standard."  Overcash v. Shelnutt, No. 5:15-cv-555-Oc-41PRL, 2017 U.S. Dist. LEXIS 222810, at *7 (M.D. Fla. Aug. 10, 2017) (citing Thompson, 610 F.3d at 665).

Under the second prong of the test, the question is:  "Whether the attorney should have known they were frivolous" or, stated differently, whether "a reasonable investigation would have revealed the error to a reasonably competent attorney."  Id.  The Complaint and its allegations would not have been filed if the attorney had conducted a reasonable investigation.

Regardless of the above test, the Court is also faced with the following facts:  1) the Complaint is filed for an improper purpose, the furtherance of the extortion demands of the Plaintiff and his wife, and 2)  on its face, an objective reading of the Complaint shows that it fails to state a valid, legal cause of action.

Rule 11, also allows for sanctions to be imposed against a party or its attorney for failing to "engage in a reasonable inquiry to determine that the information presented to the court is true."  Logan v. Chestnut, 332. F.App'x 547, 547 (11th Cir. 2009).

The purpose of Rule 11, Federal Rules of Civil Procedure, is "to discourage dilatory

or abusive tactics and streamline the litigation process by lessening frivolous claims or defenses." Donaldson v. Clark, 819 F.2d 1551, 1556 (11th Cir. 1987) (en banc).  To accomplish this purpose, any interpretation of Rule 11 "must give effect to the rule's central goal of deterrence." Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 393 (1990).  "Rule 11 sanctions are appropriate:  (1)  when a party files a pleading that has no reasonable factual basis;  (2)  when the party files a pleading that is based on a legal theory with no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law;  or (3)  when the party files a pleading in bad faith and for an improper purpose." White v. GM L. Firm, LLC, No. 21-cv-80896-SINGHAL/MATTHEWMAN, 2023 U.S. Dist. LEXIS 221956, at *6 (S.D. Fla. Dec. 13, 2023) (citing, Briggs, 245 F. App'x at 936 and Massengale v. Ray, 267 F.3d 1298, 1301 (11th Cir. 2001)).

Furthermore, "Rule 11 [of the Federal Rules of Civil Procedure] grants courts the power to sanction litigants and attorneys who make assertions without proper evidentiary support." Gonzalez v. Petromar Int'l, Inc., No. 22-60574-CIV-SINGHAL, 2023 U.S. Dist. LEXIS 225194, at *3 (S.D. Fla. June 27, 2023) (quoting, Battles v. City of Ft. Myers, 127 F.3d 1298, 1300 (11th Cir. 1997).

The Court may subject represented parties such as this Plaintiff to Rule 11 sanctions if, for example:  (1)  allegations in the complaint were frivolous and Plaintiff "knew or should have known that the allegations in the complaint were frivolous";  (2) Plaintiff "misrepresent[ed] facts in the pleadings";  or (3)  the action was frivolous and Plaintiff was the "mastermind" behind the frivolous case. Byrne v. Nezhat, 261 F.3d 1075, 1117-18 (11th Cir. 2001), abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008) (citing Baker v. Alderman,

158 F.3d 516, 524 (11th Cir. 1998)).  It appears that Plaintiff and his wife (and, perhaps, one or more others) were the "masterminds" behind this frivolous case.

Rule 11(c), Federal Rules of Civil Procedure, states:

> **(c) Sanctions.**
>
> (1)  **In General.**  If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.
>
> (2) **Motion for Sanctions.** A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b).  The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets. If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.
>
> (3)  **On the Court's Initiative.** On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b).
>
> (4)  **Nature of a Sanction.** A sanction imposed under this rule . . . may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.
>
> (5)  **Limitations on Monetary Sanctions.** The court must not impose a monetary sanction:

(A)   against a represented party for violating Rule 11(b)(2); or

(B) on its own, unless it issued the show-cause order under Rule 11(c)(3) before voluntary dismissal or settlement of the claims made by or against the party that is, or whose attorneys are, to be sanctioned.

(6) **Requirements for an Order.** An order imposing a sanction must describe the sanctioned conduct and explain the basis for the sanction.

### Standards of the Legal Profession Must be Upheld

However, in addition to Rule 11, members of The Florida Bar are expected to uphold certain standards of the legal profession that include the following:

1.      Candor and civility must be used in all oral and written communications, including online communications.  (R. Regulating Fla. Bar 4-8.4(c)).

2.      A lawyer must avoid disparaging personal remarks or acrimony toward opposing parties, opposing counsel, third parties or the court. (R. Regulating Fla. Bar 4-8.4(d)).

3.      A lawyer must not knowingly misstate, misrepresent, or distort any act or legal authority to the court or to opposing counsel and must not mislead by inaction or silence.  Further, the discovery of additional evidence or unintentional misrepresentations must immediately be disclosed or otherwise corrected. (See R. Regulating Fla. Bar 4-3.3 and 4-8.4).

### The Court Has Inherent Authority to Control Its Docket and the Parties That Appear Before It, Including by Striking Pleadings

Courts have the inherent authority to control the parties that appear before it,

including the authority to strike pleadings that are sham pleadings or which attempt to perpetrate a fraud upon the court.

The Florida Supreme Court case of Rhea v. Hackney, 117 Fla. 62, 157 So. 190 (1934), is still good law, even in federal courts.[9]  It was quoted extensively with approval by the Fifth Circuit Court of Appeals in Hamer v. Pennel, 86 F.2d 227, 229 (5th Cir. 1938), which is binding precedent on this Court.  Rhea stands for the proposition that a court has inherent authority to strike pleadings that are false or sham.

> A plea[ding] is considered sham when it is palpably or inherently false, and from the plain or conceded facts in the case, must have been known to the party interposing it to be untrue. Pleading a matter known by the party to be false for the purpose of delay or other unworthy object, has always been considered a very culpable abuse against justice, and at common law was subject to censure and summary setting aside with costs. . . . The power to eliminate sham pleadings is an indispensable power to the protection and maintenance of the character of the court, and the proper administration of justice.

Rhea v. Hackney, 117 Fla. 62, 70 (1934).  The Complaint in the present case cannot be viewed by this Court as anything other than a sham pleading.

A district court has the power to strike a pleading as a sanction as part of its inherent "authority to enforce its orders and ensure prompt disposition of legal actions."  Raghubir v. U.S., No. 22-12709-A, 2023 U.S. App. LEXIS 5327, at *2 (11th Cir. 2023) (citing State Exch. Bank v. Hartline, 693 F.2d 1350, 1352 (11th Cir. 1982)) (citing Link v. Wabash Railroad Co., 370 U.S. 626, 630-31 (1962).

---

[9]   Additionally, Plaintiff has pleaded state law causes of action in the Complaint.

District courts have the inherent authority to control their dockets and ensure prompt resolution of lawsuits. Adeniji v. Bondi, 786 F. App'x 1002 (11th Cir. 2019) (quoting Vibe Micro, Inc. v. Shabanets, 878 F.3d 1291, 1295 (11th Cir. 2018)). This authority includes the ability to strike sua sponte a complaint that does not comply with pleading standards. Adeniji, 786 F. App'x at 1002 (quoting Vibe Micro, 878 F.3d at 1295). Accord, Terry v. Robinett, No. 2:20-cv-01058-RAH-SRW, 2021 U.S. Dist. LEXIS 159180, at *13-14 (M.D. Ala. Aug. 23, 2021). The Complaint in this case should be stricken by the Court.

## CONCLUSION

Plaintiff's Complaint is frivolous and a sham. It contains false statements of fact and law. It is filed for an improper purpose. It is a fraud upon the Court. The claims stated do not remotely pass muster under federal or state law. It violates Rule 11, Federal Rules of Civil Procedure. Sanctions against both Plaintiff and Plaintiff's counsel are required.

## CLAIM FOR ATTORNEY'S FEES AND COSTS

Defendants are also entitled to their attorney's fees and costs pursuant to 18 U.S.C. Sect 1595(a), 29 U.S.C., Sect. 216(b) and Section 448.08, Florida Statutes, and Rule 11, Federal Rules of Civil Procedure. Defendants specifically seek attorney's fees and costs from both the Plaintiff, individually, and the Plaintiff's attorney, individually.

## RELIEF REQUESTED

Defendants, Gutteridge JeanCharles, M.D., P.A., and Gutteridge Jean-Charles, M.D., respectfully request that this Court enter an Order, containing the details required by Rule 11(c)(6), and that:

A.      Requires the Plaintiff and the Plaintiff's attorney, Lisa Haba, Esquire, and her

law firm, to show cause as to whether Rule 11, Federal Rules of Civil Procedure, has been violated and why sanctions should not be imposed against Plaintiff John Doe, individually, and Lisa Haba, Esquire, individually, and her firm;

B.    Strikes the Complaint as a sham pleading and a fraud upon the court and dismisses this cause of action with prejudice;

C.    Issues an award of attorney's fees and costs in this matter to the Defendants from Plaintiff John Doe, individually, and Lisa Haba, Esquire, individually, and her firm, jointly, severally, and individually;

D.    Requires payment of a penalty or $10,000 by Plaintiff John Doe, individually and Lisa Haba, Esquire, and her firm, to the American Medical Association Foundation, to be used for community health purposes, or, alternatively, into the Court; and

E.    Awards whatever additional sanctions this Court believes to be appropriate.

## CERTIFICATE OF SAFE HARBOR COMPLIANCE

This Motion or one substantially similar to it was originally served on counsel for Plaintiff on April 24, 2024, but not filed.  Exhibit "7."  As of this date, more than 21 days later, Plaintiff has not responded or corrected the deficiencies noted.

## LOCAL RULE 3.01(g) CERTIFICATION

On April 24, 2024, undersigned counsel for Defendants sent a letter to counsel for Plaintiff, Lisa Haba, Esquire, setting forth their position in this Motion.  Exhibit "7."  On May 16, 2024, undersigned counsel spoke by telephone with Ms. Haba regarding her position on this Motion.  At that time Ms. Haba confirmed that she had received this Motion but stated that it was an inappropriate motion and that Plaintiff was prohibited from filing this Motion for at least 30 days after her receipt of it, not 21 days.  Ms. Haba also threatened

undersigned counsel that if he filed this Motion, then she would file a Rule 11 motion against him for filing this Motion.  Ms. Haba made it clear that she disagreed with the relief requested by this Motion, so the parties were unable to reach a resolution.

## VERIFICATION OF MOTION

I, Gutteridge Jean-Charles, M.D., hereby declare, under penalty of perjury, that I have personal knowledge of the facts stated in this Motion and that they are true.

_____, 5/20/24

**GUTTERIDGE JEAN-CHARLES, M.D.   / DATE**

## CERTIFICATE OF SERVICE

I certify that I served this Motion on counsel for the Plaintiff, Lisa Haba, Esquire, via the Court's CM/ECF electronic filing system, which serves all parties, and also via e-mail and U.S. mail, postage prepaid, on this 20th day of May 2024.

_____

**GEORGE F. INDEST III, ESQUIRE**
**LEAD COUNSEL/TRIAL COUNSEL/**
**COUNSEL TO BE NOTICED**
Certified by The Florida Bar in Health Law
Florida Bar No.: 382426
Primary E-mail: GIndest@TheHealthLawFirm.com
Secondary E-mail: Courfilings@TheHealthLawFirm.com
**THE HEALTH LAW FIRM, P.A.**
1101 Douglas Avenue, Ste. 1000
Altamonte Springs, Florida 32714
Telephone:  (407) 331-6620
Telefax:  (407) 331-3030
COUNSEL FOR DEFENDANTS,
GUTTERIDGE JEANCHARLES, M.D., P.A., and
GUTTERIDGE JEAN-CHARLES, M.D.

ATTACHED:  Exhibits "1" through "7"