## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISON

YASSER ESMAEIL,

      Plaintiff,

      v.

GUTTERIDGE JEANCHARLES, M.D.,
P.A., a Florida Corporation, and
GUTTERIDGE JEAN-CHARLES, M.D.,
an individual,

      Defendants.

**CASE NO.** 6:24-cv-34-RMN

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT

## INTRODUCTION

1.     Dr. Jean-Charles targeted desperate and vulnerable Immigrant Medical Graduates ("IMG"), he lured them to work for JC Medical Center with the promise of compensation, experience, and a recommendation letter to help them "match" a residency program, he withheld payment or underpaid these vulnerable IMG's, and has coerced them to work full-time hours seeing scores of patients.

2.     Dr. Jean-Charles profited from this operation while his victims remained desperate, scared, and poverty stricken.

3.     Plaintiff was one such victim.

4.     Plaintiff respectfully submits his Complaint for damages and makes the following averments.

## JURISDICTION AND VENUE

5.      This case was originally filed in federal court pursuant to federal question subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, because Plaintiff brought this action under 18 U.S.C. § 1595.  This First Amended Complaint solely contains state law violations.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1361 because all of the events or omissions giving rise to the claims asserted in this action, including the Defendant's misconduct and omissions, occurred in Orange County, Florida, which is within the Middle District of Florida.

## THE PARTIES

7.      Plaintiff Yasser Esmaeil is a U.S. permanent resident that resides in Central FL and is *sui juris.*

8.      Defendant Gutteridge Jean-Charles ("Dr. Jean-Charles") is a resident of the State of Florida and is *sui juris*.

9.      Defendant Gutteridge JeanCharles, M.D., P.A. is a Florida Corporation with its principal place of business at 453 N. Kirkman Road, #203, Orlando, FL 32811.  At all relevant times to this Complaint, this Florida Corporation, has been doing business as JC Medical Center (hereinafter "JC Medical Center").

10.     JC Medical Center is the alter-ego of Dr. Jean-Charles.

## FACTUAL ALLEGATIONS

11.     Plaintiff is a physician from Egypt, who entered the U.S. on a J-1 Exchange Visitor Visa to seek advanced training in a US-medical residency program.

12.    Plaintiff married his (now) wife and applied for a visa waiver so that Plaintiff could lawfully remain in the U.S.

13.    Receiving the waiver caused a delay in Plaintiff's application for a green card and work authorization to be submitted.

14.    While Plaintiff was waiting for his legal paperwork, he began applying to "match" with, and be accepted to a residency program.

15.    Without work authorization, he was not able to "match" a residency program.

16.    Plaintiff determined that he needed to work in a clinic to gain experience so that the following year, he could "match" a residency program.

17.    Plaintiff found an advertisement on Indeed.com put forth by Dr. Jean-Charles, M.D. which was for employment with the JC Medical Center.  The advertisement offered full-time employment with a salary of $500 per month in Orlovista, Florida.

18.    On March 22, 2022, Plaintiff submitted an application on Indeed.com for this job opportunity.

19.    On March 26, 2022, Dr. Jean-Charles conducted an interview of Plaintiff via video-call.  During the interview, Dr. Jean-Charles told Plaintiff:

    a.  how his program helped many International Medical Graduates get into residency programs;

    b.  Plaintiff would get a "stipend" as compensation and moving reimbursement since Plaintiff and his family were moving across the

3

country;

   c. Plaintiff admitted that his application for his green card and work authorization were submitted to USCIS but had not been received yet;

   d. Dr. Jean-Charles offered to write USCIS a letter to speed up the process; and

   e. Dr. Jean-Charles confirmed that as long as the application for work authorization was submitted, he was willing to hire Plaintiff and would pay him.

20.   At the conclusion of the interview, Dr. Jean-Charles emailed Plaintiff a job offer, stating:

   a. The employment position was for a "Clinical Assistant" at the JC Medical Center and the employee would shadow, learn, train, and be taught about the practice of medicine.

   b. "The program offers a stipend to assist in cost-of-living expenses."

   c. The program "is for a term of one year. It will automatically renew unless the candidate starts residency in an accredited program in the USA."

   d. Plaintiff was invited to meet the team on Friday, April 1, 2022.

21.   On the same day, Plaintiff responded, stating that he wished to make his final decision after the meeting on Friday and expressed his interest in the position.

22.   On March 28, 2022, Plaintiff emailed the Assistant Manager to confirm that relocation reimbursement would be offered.

4

23.     On March 29, 2022, Plaintiff receive an email stating that "Dr. Jean Charles will consider relocation reimbursement based on your commitment." Plaintiff understood this, in combination with the previous statements made, to be an affirmation.

24.     On April 1, 2022, Plaintiff met with Dr. Jean-Charles and his staff at the JC Medical Center.

25.     Plaintiff inquired again about the salary and told Dr. Jean-Charles that he could not afford to work without compensation and the moving reimbursement that had been promised.

26.     Dr. Jean-Charles stated that a Clinical Assistant position would make $32,000 - $36,000 per year.

27.     While at the office, Dr. Jean-Charles had him meet another employee who had just "matched" into a residency program. Dr. Jean-Charles knew that "matching" a residency was Plaintiff's goal and he dangled this to cause Plaintiff to believe JC Medical Center would help him acquire his own "match."

28.     At the conclusion of the office visit, Plaintiff flew back home and shortly thereafter, confirmed he would take the job.

29.     At all material times to this Complaint, Dr. Jean-Charles was the sole, licensed doctor at JC Medical Center.

30.     All employees and those employed by the practice answer to Dr. Jean-Charles, as he has the final decision-making authority over all matters of this practice.

31.     On April 17, 2022, Plaintiff flew back to Florida to start work as an

employee of JC Medical Center.

32.    On the same day, Dr. Jean-Charles led Plaintiff to believe he would be compensated by sending Plaintiff a link to an app called Gusto.  Dr. Jean-Charles represented that this was the app that was used to pay the employees.

33.    On April 18, 2022, Plaintiff showed up for his first day at work.

34.    Surprisingly, Plaintiff was instructed by the office manager that he was required to provide his own laptop for office work.

35.    Plaintiff was unable to access Gusto due to lack of work authorization paperwork, so he brought it to the office manager's attention.

### Refusal to Compensate Plaintiff

36.    The manager reported the Gusto login issue to Dr. Jean-Charles, and the Plaintiff then met with Dr. Jean-Charles.  In that meeting, they discussed the fact that Plaintiff's work authorization had not been granted yet.  Despite previously having knowledge of this and agreeing to overlook it to entice Plaintiff to take the job, Dr. Jean-Charles suddenly acted like he didn't know Plaintiff's immigration situation.

37.    Dr. Jean-Charles told Plaintiff that he should not have told anyone in the office about his lack of work authorization. He stated it was a "dangerous and delicate matter" and that all he was able to do was allow Plaintiff to "volunteer" for three months.

38.    Plaintiff understood this statement to be a veiled threat that Dr. Jean-Charles would contact USCIS.

39.    Plaintiff asked "what about the compensation?" Dr. Jean-Charles again

changed his position and stated "First, I need to see how you do.  I will give you your compensation in the form of gift cards."

40.    Dr. Jean-Charles agreed to employ Plaintiff and provide compensation, not have him "volunteer."

41.    In direct contradiction to his prior statement, Dr. Jean-Charles stated that he did not believe writing to USCIS would speed anything up so he would not be writing them a letter.

42.    On April 19, 2022, Dr. Jean-Charles emailed Plaintiff, stating: "This is an official communication to confirm your request to be granted the status of "Volunteer" at the JC Medical Center for a period of three months in which you will be receiving training and an opportunity to gain valuable US clinical experience as an IMG. This training period will be followed by a salaried position starting July 2022, if all goes according to plan and all other requirements are met."

43.    Plaintiff knew that he only had a few months left until the residency application submission window opened.  With that, he knew he did not have the ability to seek another job.

44.    Based on statements made to him by Dr. Jean-Charles, Plaintiff believed that Dr. Jean-Charles held the "keys" to getting him necessary recommendation letter to successfully "match" a residency program.

45.    Based on statements made to him by Dr. Jean-Charles, Plaintiff also believed that he was going to receive compensation in the amount offered in the future.

46.    Plaintiff was expected to work a full-time job, as well as weekends.  He

was not offered overtime pay or any additional compensation.

47.    Plaintiff was seeing 30-40 patients a day himself.

### JC Medical Center Has A High Volume of Clients

48.    JC Medical Center scheduled around 75 patients a day and about 50-60 of those patients came to the office each day.

49.    To treat this many patients, the office employed two providers and three clinical assistants Monday – Friday.  On Saturday, the office employed three providers and two clinical assistants.

50.    Most of the patient population served spoke Creole and little to no English.

51.    Upon information and belief, no person working at JC Medical Center is licensed to practice medicine in the U.S. except for Dr. Jean-Charles.

52.    Some employees in the office would independently sign Dr. Jean-Charles's electronic signature to medication prescriptions.

53.    Upon information and belief, Dr. Jean-Charles was aware of this and allowed this practice to continue.

### Failure to Direct, Teach, or Train Plaintiff

54.    Plaintiff was not provided any understanding as to what his duties as a Clinical Assistant were.

55.    Plaintiff was not provided any training to oversee how he was doing tasks, or to teach him.

56.    Despite the lack of training, Dr. Jean-Charles immediately began having

8

Plaintiff interact with patients, take vitals, and collect medical histories.

57.    There was no teaching or training.  When mistakes were made, he was ominously scolded instead of taught how to correct the mistake.

58.    On May 2, 2022, Plaintiff received an email from Dr. Jean-Charles discussing a "Clinical Internship."  The email asked him to prepare a weekly progress report to ensure the program was continually improving.

59.    On May 4, 2022, Dr. Jean-Charles explained his evaluation process to Plaintiff and his team.  He stated that he primarily relies on patient feedback, which is supposedly gathered through Dr. Jean-Charles selectively calling patients to ask for their subjective feedback.

60.    Dr. Jean-Charles used humiliation in his "teaching" approach, calling out and embarrassing his employees and interns in front of their colleagues, to include Plaintiff.

61.    Dr. Jean-Charles was quick to berate, belittle, and criticize employees and interns, including Plaintiff.

62.    Upon information and belief, Dr. Jean-Charles used this tactic to cause his employees and interns to doubt their own self-worth, knowledge base, and skill level so that he could continue to receive the underpaid or free labor for his own commercial gain.

### *Exploitation of Plaintiff*

63.    Plaintiff was one of various IMGs working for Dr. Jean-Charles; there was another doctor from Haiti who did not speak about his immigration status,

worked as a "volunteer" on the books, and performed the duties of a Clinical Assistant.

64.    Dr. Jean-Charles expected Plaintiff to see patients in the clinic. Dr. Jean-Charles did not consult with Plaintiff on each patient's care and presumably reviewed the files at the end of the day from his house.

65.    Dr. Jean-Charles's lack of oversight left individual patient care in the hands of a Clinical Assistant who was still learning and had nominal experience.

66.    Dr. Jean-Charles told Plaintiff to call the Assistant Program Director anytime he had a question. Dr. Jean Charles came to the clinic around noon on most days. He spent most of his time with foreign medical students who pay him for virtual and onsite access to his practice.

67.    On May 24, 2022, Plaintiff again asked Dr. Jean-Charles for a letter to help speed up the work authorization process. Dr. Jean-Charles responded "I haven't forgotten about your letter. I want to know who you are."

68.    This statement made Plaintiff believe that his compensation and recommendation letter were still forthcoming.

69.    Plaintiff and his wife had spent all their savings. Plaintiff had not received any compensation, nor the relocation reimbursement that had been promised as part of the employment.

70.    Desperate for money, Plaintiff contacted the officer manager, and explained that he'd been promised compensation through gift cards but hadn't been paid yet. He was told that the office manager would have to discuss that with Dr. Jean-Charles.

71.    On June 7, 2022, Dr. Jean-Charles followed up with Plaintiff about his compensation and berated him for bringing the question to the office manager.  He stated that he could not give him any money until his immigration status cleared.

72.    In early to mid-June, 2022, Dr. Jean-Charles began allowing Plaintiff to put Dr. Jean-Charles's electronic signature on orders for labs and referrals.

73.    Plaintiff was told that Dr. Jean-Charles was reviewing the files with these in them at the conclusion of the day.

74.    On June 10, 2022, Dr. Jean-Charles met with Plaintiff and offered him a 3-year employment contract – the position was 1 year as a Clinician Assistant, and then a junior physician-in-training for the following 2 years.  If Plaintiff "matched" and started a residency program in the USA, he could be released from the contract.

75.    To lure, entice, and coerce Plaintiff to sign this 3-year contract, Dr. Jean-Charles again offered to help with immigration and again promised a salary.  He offered:

| YEAR | JOB POSITION | SALARY | INCREASE |
|------|--------------|--------|----------|
| Year 1 | Clinician Assistant | $36,000 | |
| Year 2 | Junior Physician in Training | $52,000 | 36% increase in salary |
| Year 3 | Junior Physician in Training | $78,000 | 66% increase in salary |

76.    The 3-year offer had an early termination penalty of $20,000.00 plus legal fees.  An exception to the penalty existed if Plaintiff to quit in order to accept a medical

11

residency position.

77.     On June 13, 2022, Plaintiff responded, notifying Dr. Jean-Charles that he had been offered compensation and moving reimbursement, which he had never provided.  Plaintiff requested being paid the money he had been originally promised and relied upon when he started working for Dr. Jean-Charles.

78.     In response, Dr. Jean-Charles retaliated by cancelling the job offer to Plaintiff.

79.     On June 17, 2022, the office manager informed Plaintiff that Dr. Jean-Charles was switching his duties from being "in the back" to being "in the front," away from the fast-moving clinical work that Plantiff loved and provided him experience.

80.     He was also told that he'd have his own schedule under the name of "Chronic Care Clinic, CCC."

81.     On that same day, Dr. Jean-Charles asked Plaintiff to stay late.  Dr. Jean-Charles gave Plaintiff a $200 gift card.

82.     Dr. Jean-Charles flip-flopped and again encouraged Plaintiff to agree to the 3-year contract.  Dr. Jean-Charles reaffirmed how valuable the experience of being at his office was and baited Plaintiff by complimenting what a good job he was doing.

83.     On June 21, 2022, Plaintiff began working the Chronic Care Clinic schedule.  In this role, Plaintiff was expected to see Dr. Jean-Charles' patients without supervision.

84.     Plaintiff had observed at least one other clinical assistant also treating Dr. Jean-Charles' patients without supervision.

85.    At this level of experience and education, any clinical assistant should be supervised by Dr. Jean-Charles.

86.    On June 22, 2022, Dr. Jean-Charles indirectly threatened Plaintiff by stating that he could be replaced by another student because his position was very valuable and coveted.  Dr. Jean-Charles frequently made comments of this genre to ensure Plaintiff remained obedient and compliant, hoping to earn the salary and recommendation letter that he had been offered and never received.

87.    On June 29, 2022, Dr. Jean-Charles told Plaintiff that he did not deliberately pick Plaintiff as the first person to go to the front. He said he just thought [Plaintiff] already had the clinical part of the job down, and that he "wanted to teach [Plaintiff] something else."

88.    That same day, Dr. Jean-Charles got cold feet and completely moved Plaintiff out of all patient contact. He said, "[y]ou're too involved in patient care and you don't have your papers. I know you were [previously] a medical resident and these things come naturally for you, but I cannot risk it." Instead, he assigned Plaintiff to identify patients in the system who did not have a wellness visit this year, and to send those names to the scheduler, and to assist another employee with vital signs and histories.

89.    Plaintiff was frustrated, as he was in an impossible situation:

a.  Dr. Jean-Charles had told him that he would not "match" a residency program without the clinical experience Dr. Jean Charles offered at his medical center.

13

b. It was already July and Plaintiff had almost 3 months of experience as a clinical assistant. If Plaintiff quit, Dr. Jean-Charles would not write a recommendation letter, causing Plaintiff to have wasted the time and miss the application window. Additionally, it was too late to get any similar experience that could be added to the application.

c. Plaintiff and his wife were struggling financially – they were still expecting and relying on the promise of payment, which kept being extended into future payment from Dr. Jean-Charles.

90. On July 1, 2022, the office manager confirmed for Plaintiff that Dr. Jean-Charles had authorized Plaintiff to see patients and help in the back when they were overwhelmed. This was in direct contradiction to what was previously stated.

91. On July 5, 2022, Plaintiff was walking to work when the office manager called and asked him to please work in the back (the busy clinical area) and cover a shift for another clinical assistant who called out sick.

92. On July 5, 2022, Dr. Jean-Charles stated he was going to give Plaintiff something at the end of the day. Plaintiff was desperate for money and humiliated that he had to beg for it. At the end of the day, Dr. Jean-Charles stated he'd forgot and stated he was going to "do it tomorrow."

93. The next day, Dr. Jean-Charles did not give Plaintiff any money.

94. On July 7, 2022, a family member of Plaintiff's reached out to Dr. Jean-Charles and told him that Plaintiff did not know about the email but that what Dr. Jean-Charles was doing to him was labor trafficking. He encouraged Dr. Jean-Charles

14

to honor his contract with Plaintiff.

95.     On July 8, 2022, Dr. Jean-Charles responded defensively, denied knowing that Plaintiff did not have work authorization when he hired him, and demanded that the family member cease and desist contacting him.

96.     That same day, Dr. Jean-Charles gave Plaintiff a bribe to silence him; he handed him an envelope with $500 cash and a $450 Visa gift card.

97.     On July 9, 2022, Plaintiff's work account was blocked.  When he asked about this, Dr. Jean-Charles emailed back stating that "the account was setup for a 3-month observership with an expiration date.  Unless you obtain your work authorization, I will not be able to reinstate it."  This was in direct conflict with the prior job offers, promises of compensation, encouragement to work, and the title of being a clinical assistant.

98.     Additionally, the officer manager could no longer find Plaintiff's name in the employee registry.  Upon information and belief, Dr. Jean-Charles deleted him from the employee log.

99.     On July 12, 2022, Dr. Jean-Charles encountered Plaintiff in the clinic parking lot.  Dr. Jean-Charles stated that someone was "advocating" for Plaintiff and had accused Dr. Jean-Charles of human trafficking.  He stated that the Plaintiff's advocate was talking about "dangerous stuff" and he no longer wanted Plaintiff in his practice.

100.    Dr. Jean-Charles did not offer to compensate Plaintiff for the time and effort he gave the practice, despite the fact that Plaintiff worked about 720 hours as an

employee of JC Medical Center.

101.    Dr. Jean-Charles did not offer to reimburse Plaintiff for the relocation expenses that were incurred, despite his prior offer to cover up to $3000 for relocation.

## CAUSES OF ACTION

### COUNT I

### BREACH OF CONTRACT
#### (*Defendant JC Medical Center*)

102.    Plaintiff realleges and incorporates by reference paragraphs 1-101 as if fully incorporated herein.

103.    Plaintiff received an official offer of employment from JC Medical Center to work as a Clinical Assistant.  That offer included a stipend, the job was for one year in length, and required the employee to train his replacement before leaving to start residency.  JC Medical Center agreed to pay up to $3000 in relocation expenses. (See Exhibit A).

104.    Plaintiff accepted this offer.  (See Exhibit B).

105.    Consequently, Plaintiff and JC Medical Center entered into a valid and enforceable contract.

106.    The salary stipend and relocation reimbursement were material inducements to Plaintiff's decision to accept employment.

107.    Relying on this accepted offer, Plaintiff incurred moving costs and relocated himself and his family across the country to relocate to Florida.

108.    Relying on this accepted offer, Plaintiff took this opportunity to enhance

his resume and work to gain valuable experience to "match" a residency, and in doing

so, did not select any other opportunities.

109.    Plaintiff worked full-time hours plus overtime for several months with

the expectation of payment.

110.    The Employment Contract was not amended mutually by both parties.

111.    JC Medical Center breached the contract by:

    a.  unilaterally not paying Plaintiff as contracted;

    b.  not reimbursing Plaintiff for relocation costs as agreed;

    c.  unilaterally reducing the term of employment to a shorter period of
       time than one year as provided in the contract; and

    d.  breaching the implied covenant of good faith and fair dealing by
       misrepresenting to Plaintiff that he was not entitled to any notice or
       process, or a finding of just cause, prior to having
       his salary and employment term of one year unilaterally terminated
       after 3 months.

112.    Plaintiff has been damaged by JC Medical Center's breach of the

contract.  Defendant's conduct has caused Plaintiff to lose the benefits and privileges

of employment, the educational opportunities from employment, time to engage in a

reputable program to apply for residency "match," lost wages, and he incurred moving

expenses associated with his acceptance of JC Medical Center's offer to employ him.

113.    Plaintiff incurred attorney's fees and costs to bring this action.  Plaintiff

is entitled to an award of prevailing party attorney's fees pursuant to Florida Statute §

448.08, and other related authority.

114.    Plaintiff has been damaged in an amount over $50,000.00.

WHEREFORE, Plaintiff demands judgment against Defendant JC Medical Center for accrued unpaid wages, in an amount to be proven at the time of trial; accrued interest on those sums at the applicable judgment rate of interest; all of his negotiated wages and reimbursements under the contract, compensatory damages resulting from the breach of contract, award him reasonable attorney's fees and costs, and such further relief as this Court deems just and proper.

## COUNT II
### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (*Defendant JC Medical Center*)

115.    Plaintiff realleges and incorporates by reference paragraphs 1-101 as if fully incorporated herein.

116.    As a party to the contract, JC Medical Center was bound and required to deal in accordance with an implied covenant of good faith and fair dealing owed to Plaintiff.

117.    As a Clinical Assistant employed by JC Medical Center for one year, Plaintiff enjoys a property interest in his continued employment during the negotiated term of employment, and in his negotiated salary during the negotiated term of employment, which the Defendant may not unilaterally deprive without due process of law and finding of cause.

118.    JC Medical Center breached their covenant of good faith and fair dealing

with Plaintiff by, not only failing to provide him with notice and an opportunity to be heard, prior to unilaterally reducing  or eliminating the negotiated salary and negotiated term of one year, but also by affirmatively misrepresenting to their employee that he was entitled to no notice whatsoever for changes to the employment contract and/or that his contract did not govern the terms of his employment.

119.    Plaintiff has been damaged by JC Medical Center's breach of its implied covenant of good faith and fair dealing.  Defendant's conduct has caused Plaintiff to lose the benefits and privileges of employment, the educational opportunities from employment, time to engage in a reputable program to apply for residency "match," lost wages, and he incurred moving expenses associated with his acceptance of JC Medical Center's offer to employ him.

120.    Plaintiff incurred attorney's fees and costs to bring this action.  Plaintiff is entitled to an award of prevailing party attorney's fees pursuant to Florida Statute § 448.08, and other related authority.

121.    Plaintiff has been damaged in an amount over $50,000.00.

WHEREFORE, Plaintiff demands judgment against Defendant JC Medical Center for accrued unpaid wages, in an amount to be proven at the time of trial; accrued interest on those sums at the applicable judgment rate of interest; all of his negotiated wages and reimbursements under the contract, compensatory damages, award him reasonable attorney's fees and costs, and such further relief as this Court deems just and proper.

## COUNT III

## CONTRACT IMPLIED IN LAW
### (*Defendant JC Medical Center*)

122.    Plaintiff realleges and incorporates by reference paragraphs 1-101 as if fully incorporated herein.

123.    This quasi-contract count is plead in the alternative to the breaches of contract set forth above.

124.    Plaintiff and JC Medical Center entered into an arrangement in which Plaintiff would provide employment services to the Defendants in exchange for compensation and moving costs reimbursement.

125.    Plaintiff has conferred a benefit on JC Medical Center by not cancelling his employment and labor and allowing it to proceed under specified terms and conditions.

126.    JC Medical Center had knowledge of the benefit conferred by Plaintiff.

127.    The circumstances are such that it would be inequitable for JC Medical Center to retain the benefit provided by Plaintiff without paying fair value for it.

128.    Plaintiff has been damaged in an amount over $50,000.00.

WHEREFORE, Plaintiff demands judgment against Defendant JC Medical Center for accrued unpaid wages, in an amount to be proven at the time of trial; accrued interest on those sums at the applicable judgment rate of interest; all of his negotiated wages and reimbursements under the contract, compensatory damages,

award him reasonable attorney's fees and costs, and such further relief as this Court deems just and proper.

## COUNT IV

### CONTRACT IMPLIED IN FACT
### (*Defendant JC Medical Center*)

129.    Plaintiff realleges and incorporates by reference paragraphs 1-101 as if fully incorporated herein.

130.    This quasi-contract count is plead in the alternative to the breaches of contract set forth above.

131.    Plaintiff and JC Medical Center entered into an arrangement in which Plaintiff would provide employment services to the Defendants in exchange for compensation and moving costs reimbursement.

132.    Based on the facts and circumstances surrounding the dealings between the parties, and as manifested in the acts and conduct of Plaintiff and JC Medical Center, there was an indication of a meeting of minds of the parties constituting an agreement.

133.    Plaintiff fully performed his obligations under the agreement.

134.    JC Medical Center breached the agreement by failing to cause Plaintiff to receive the agreed upon sums/value owed to Plaintiff.

135.    Plaintiff has been damaged in an amount over $50,000.00.

WHEREFORE, Plaintiff demands judgment against Defendant JC Medical Center for accrued unpaid wages, in an amount to be proven at the time of trial; accrued interest on those sums at the applicable judgment rate of interest; all of his

negotiated wages and reimbursements under the contract, compensatory damages, award him reasonable attorney's fees and costs, and such further relief as this Court deems just and proper.

## COUNT V

## FRAUDULENT MISREPRESENTATION
### (*Defendant JC Medical Center*)

136.    Plaintiff realleges and incorporates by reference paragraphs 1-101 as if fully incorporated herein.

137.    Dr. Jean Charles, acting on behalf of JC Medical Center, intentionally made false statements to Plaintiff as set forth above the job opportunity, relocation reimbursement, and the amount to be received and compensation, or intentionally omitted relevant facts from his statements regarding the job opportunity, relocation reimbursement, and the amount to be received and compensation.

138.    Dr. Jean Charles, acting on behalf of JC Medical Center, knew or should have known that his statements were false when he made them, or knowingly omitted to tell the truth when he should have done so.

139.    Dr. Jean Charles, acting on behalf of JC Medical Center, made the statements or omissions intending that Plaintiff would rely on the false statements or omissions.

140.    Plaintiff did reasonably and justifiably rely upon the statements or omissions of Dr. Jean Charles, acting on behalf of JC Medical Center, and has been damaged thereby.

141.    Plaintiff's reliance caused him to relocate to Florida and being working for JC Medical Center.

142.    As a direct and proximate result, he suffered lost wages, psychological and emotional harm, pain and suffering, emotional distress, humiliation, and embarrassment, in an amount greater than $50,000.00.

WHEREFORE, Plaintiff demands judgment against Defendant JC Medical Center for fraudulent misrepresentation, interest, court costs, and such further relief as this Court deems just and proper.

## COUNT VI

## NEGLIGENT MISREPRESENTATION
### (*Defendant JC Medical Center*)

143.    Plaintiff realleges and incorporates by reference paragraphs 1-101 as if fully incorporated herein.

144.    Dr. Jean Charles, acting on behalf of JC Medical Center, made false statements to Plaintiff as set forth above the job opportunity, relocation reimbursement, and the amount to be received and compensation, or negligently omitted relevant facts from his statements regarding the job opportunity, relocation reimbursement, and the amount to be received and compensation, which statements Dr. Jean Charles may have believed were true at the time, but which statements were in fact false.

145.    Dr. Jean Charles, acting on behalf of JC Medical Center, made the subject statements or omissions, with a negligent regard for the truth of the statement.

146.    Dr. Jean Charles, acting on behalf of JC Medical Center, made the statements or omissions intending that Plaintiff would rely on the false statements or omissions.

147.    Plaintiff did reasonably and justifiably rely upon the statements or omissions of Dr. Jean Charles, acting on behalf of JC Medical Center, and has been damaged thereby.

148.    Plaintiff's reliance caused him to relocate to Florida and being working for JC Medical Center.

149.    As a direct and proximate result, he suffered lost wages, psychological and emotional harm, pain and suffering, emotional distress, humiliation, and embarrassment, in an amount greater than $50,000.00.

WHEREFORE, Plaintiff demands judgment against Defendant JC Medical Center for negligent misrepresentation, interest, court costs, and such further relief as this Court deems just and proper.

## COUNT VII

### PROMISSORY ESTOPPEL
### (*Defendant JC Medical Center*)

150.    Plaintiff realleges and incorporates by reference paragraphs 1-101 as if fully incorporated herein.

151.    Defendant JC Medical Center made a written promise to Plaintiff to employ him as a Clinical Assistant for one year and for specific remuneration payable during said term of employment (See Exhibit A).

152.    Plaintiff accepted such written promise in writing (see Exhibit B), and reasonably relied upon such promise of employment to his detriment, by moving to Florida from Colorado to accept such employment as specifically offered and accepted.

153.    Plaintiff incurred attorney's fees and costs to bring this action.  Plaintiff is entitled to an award of prevailing party attorney's fees pursuant to Florida Statute § 448.08, and other related authority.

WHEREFORE, Plaintiff demands Defendant JC Medical Center and its agents, employees, servants, subordinates, and others acting on its behalf be estopped from denying the existence of a contract which governs the terms and conditions of Plaintiff's employment relationship.

WHEREFORE, Plaintiff demands judgment against Defendant JC Medical Center for promissory estoppel, interest, court costs, and such further relief as this Court deems just and proper.

## COUNT VIII

## QUANTUM MERUIT
### (*All Defendants*)

154.    Plaintiff realleges and incorporates by reference paragraphs 1-101 as if fully incorporated herein.

155.    Plaintiff is entitled to recover from Defendants Dr. Jean-Charles and JC Medical Center because Plaintiff rendered valuable services to them in the form of medical care for JC Medical Center's patients, administrative services, and other

duties for the benefit of Defendants Dr. Jean-Charles and JC Medical Center.

156.    Defendants Dr. Jean-Charles and JC Medical Center accepted, used, and enjoyed Plaintiff's services, as demonstrated by the continued employment of Plaintiff, and Defendants were reasonably notified that Plaintiff expected to be paid because Dr. Jean-Charles promised to pay him, and he repeatedly asked to be paid.

157.    Plaintiff is entitled to recover in quantum meruit the value of the services he provided to Defendants in an amount to be proven at trial, and the court costs of this action.

WHEREFORE, Plaintiff demands judgment against Defendants Dr. Jean-Charles and JC Medical Center, jointly and severally, for quantum meruit, interest, court costs, and such further relief as this Court deems just and proper.

## COUNT VIX

## UNJUST ENRICHMENT
### (*All Defendants*)

158.    Plaintiff realleges and incorporates by reference paragraphs 1-101 as if fully incorporated herein.

159.    Plaintiff is entitled to recover from Defendants Dr. Jean-Charles and JC Medical Center because Plaintiff rendered valuable services to them in the form of medical care for JC Medical Center's patients, administrative services, and other duties for the benefit of Defendants Dr. Jean-Charles and JC Medical Center.

160.    Defendant knowingly retained that benefit by failing to provide any compensation other than $200.00 during the time that Plaintiff worked for JC Medical

Center.

161.    Defendants' retention of this benefit conferred without paying Plaintiff the value of that benefit is unjust and inequitable, as evidenced by the illegality of such conduct under the laws of the United States.

162.    Plaintiff is entitled to judgment against Defendants Dr. Jean-Charles and JC Medical Center for their unjust enrichment in an amount to be proven at trial, and court costs of this action.

WHEREFORE, Plaintiff demands judgment against Defendants Dr. Jean-Charles and JC Medical Center, jointly and severally, for unjust enrichment, interest, court costs, and such further relief as this Court deems just and proper.

## COUNT X
## DECLARATORY RELIEF
### (*All Defendants*)

163.    Plaintiff realleges and incorporates by reference paragraphs 1-101 as if fully incorporated herein.

164.    This is an action for declaratory relief, partially in the alternative to the above counts.

165.    Fla. Stat. § 86.021 states:

F.S. § 86.021 Power to construe.--Any person claiming to be interested or who may be in doubt about his or her rights under a deed, will, contract, or other article, memorandum, or instrument in writing or whose rights, status, or other equitable or legal relations are affected by a statute, or any regulation made under statutory authority, or by municipal ordinance, contract, deed, will, franchise, or other article, memorandum, or instrument in writing may have determined any question of construction or validity arising under such statute,

27

regulation, municipal ordinance, contract, deed, will, franchise, or other article, memorandum, or instrument in writing, or any part thereof, and obtain a declaration of rights, status, or other equitable or legal relations thereunder.

166.    Fla. Stat. §86.061 states:

86.061 Supplemental relief.-- Further relief based on a declaratory judgment may be granted when necessary or proper. The application therefor shall be by motion to the court having jurisdiction to grant relief. If the application is sufficient, the court shall require any adverse party whose rights have been adjudicated by the declaratory judgment to show cause on reasonable notice, why further relief should not be granted forthwith.

167.    When viewed *in toto*, Plaintiff understands that the contracts, emails and conversations between Plaintiff, JC Medical Center staff, and Dr. Jean Charles yielded the following scenario:

   a.  Plaintiff was an immigrant medical graduate and had not yet matched a residency program.

   b.  Plaintiff was offered employment at JC Medical Center by Dr. Jean Charles, which included compensation, relocation reimbursement, and assistance matching with a residency program.

   c.  Upon information and belief, Dr. Jean Charles is the sole shareholder of this practice.

   d.  Plaintiff accepted this offer.

   e.  Plaintiff relocated to Florida and began working at JC Medical Center.

   f.  Plaintiff was not compensated as agreed, nor did he receive reimbursement for relocation as agreed.

g. Plaintiff was asked to work far more hours and tasks than initially agreed and Defendants profited from the same.

168. Plaintiff believes he is entitled to have the entire dealings between the parties placed in issue before this Court.

169. Plaintiff is in doubt as to his rights and legal relations with respect to the Defendants.

170. As such, Plaintiff is an interested party entitled to obtain a declaration of the rights, status, or other equitable or legal relations between Plaintiff and Defendants.

171. Plaintiff is also seeking supplemental relief in the form of equitable and injunctive relief as pertains to the Defendants.

**WHEREFORE**, ICB demands judgment against the Defendants, declaring:

a. Plaintiff and the Defendants had a contract, or alternatively, a quasi-contract or contract implied in fact or law;

b. Plaintiff fully performed hid obligations under the contract;

c. Defendant JC Medical Center failed to fully perform its obligations under the contract;

d. Defendant Dr. Jean Charles failed to fully perform his obligations under the contract;

e. Defendants shall pay to Plaintiff any sums due under the contract if they had fully and properly performed;

f. Providing for pre-judgment as appropriate;

29

g.  Providing for attorney's fees as appropriate;

h.  Providing for the recovery of the costs of this proceeding; and,

i.  For such other, further, and different relief as the Court may deem just,

proper and equitable under the circumstances.


## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all claims so triable.


DATED: January 18, 2025                     */s/ Lisa D. Haba*
                                            Lisa D. Haba
                                            **THE HABA LAW FIRM, P.A.**
                                            1220 Commerce Park Dr., Suite 207
                                            Longwood, FL 32779
                                            Telephone: (844) 422-2529
                                            lisahaba@habalaw.com

                                            *Attorney for Plaintiff*

# EXHIBIT A

Re: Job offer

### Yasser Esmaeil <yasseresmaeil18@gmail.com>

Sat 3/26/2022 10:45 PM

To:Gutteridge Jean-Charles <gjeancharlesmd@jcmedicalcenters.com>

Dear Dr. Jean-Charles,

I am very interested in the offer, but if you don't mind I would like to make my decision after my visit to Florida. I am looking forward to meeting with you on Friday, April 1st (I already booked the flight). Since this is a big move I want to make sure that It is the best for my wife and me.

Thank you again for offering this unique opportunity. It was a pleasure talking to you as well.

Sincerely,

Yasser


On Sat, Mar 26, 2022 at 1:20 PM Gutteridge Jean-Charles <gjeancharlesmd@jcmedicalcenters.com> wrote:

> Hello Dr. Esmaeil,
>
> It was a pleasure talking to you.
>
>
> Consider this email as an official job offer for a position as a physician-in-training (non-accredited program) at JC Medical Center in Orlando. Such program has proven to be extremely valuable for IMGs who have not been successful in the residency match process or who have had other challenges to be perceived as competitive. Candidates can expect a personalized merit-based waived LoR for the ERAS application.
>
> The program offer a stipend to assist in cost of living expenses and is for a term of one year. It will automatically renew unless the candidate start residency in an accredited program in the USA. The candidate is expected to train his/her replacement prior to leaving JCMC to start residency.
>
> If you accept the responsibility of practicing under the direct supervision of the Medical Director, you will be expected to follow all the rules and regulations of JC Medical and its supervisory personnel.
>
>
> You will be provided with an orientation and training and you are expected to perform all duties with the highest ethics standard. You will come prepared to provide your best every day while caring for our patients and you will introduce yourself as "working under the direct supervision of Dr. Jean-Charles". You will be expected to do triage, obtain a history with proper documentation, complete the HPI, document the visit using the SOAP or the "long format", participate in MDM (medical decision making) and plan of care. You also will be responsible to do patient education when appropriate and discharge the patient safely home while making sure there is a scheduled follow up

appointment. You will need to work independently and as a team. You will be expected to work in collaboration with NP and/or PA. You will be expected to be a resource and support to other Physician on duty.

You will be expected to provide Telehealth visit when assigned to do so by the manager under directives of the Medical Director. You will need to become familiar with "Quality Measures" and preventive medicine. You will receive training for such. You will be expected to prepare a monthly case report and will be encouraged to participate in academic activities when appropriate or when instructed by the Medical Director.

You are invited to meet with the manager Elrick Cabrera, IMG, MHA on April 1st, in the afternoon, between 1PM and 5 PM. You will also meet with the Assistant Academic Program Director Dr. K. Khalid and myself.

For logistical support, reach out to the assistant manager Kamelia at krezagui@jcmedicalcenters.com or the manager at officemanager@jcmedicalcenters.com. The office phone is 407-914-2325.

If you accept this offer, please reply to this email with an affirmative statement. The tentative start date is April 18, 25 or May 2nd.

Regards,

Dr. Jean-Charles

Sent from Mail for Windows

--
Yasser

# EXHIBIT

# B

## Re: Start date

Yasser Esmaeil <yasseresmaeil18@gmail.com>

Sun 4/17/2022 1:42 PM

To:Gutteridge Jean-Charles <gjeancharlesmd@jcmedicalcenters.com>

Yes, I confirm. See you soon, Dr. Jean-Charles.

On Sun, Apr 17, 2022 at 1:39 PM Gutteridge Jean-Charles <gjeancharlesmd@jcmedicalcenters.com> wrote:

> Hello Yasser,
>
> Please confirm if you are going to report to duty on Monday 4/18/2022.
>
> Dr. Jean-Charles

--
Yasser